United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9          IN THE UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13   CYNTHIA SANCHEZ,                           No C 03-4581 VRW

14              Plaintiff,

15        v                                     ORDER

16   JO ANNE B BARNHART, Commissioner
     of Social Security,

17              Defendant.

18

19   _____/

20

21        Plaintiff Cynthia Sanchez brings this action under 42 USC

22   section 405(g), challenging the final decision of the Social

23   Security Administration (SSA) denying her disability benefits from

24   the period beginning January 26, 2000.  Plaintiff claims disability

25   based on orthopedic and neurological conditions.  Now before the

26   court are the parties' cross-motions for summary judgment.  The

27   court GRANTS plaintiff's motion and DENIES the government's motion.

28   \\

**United States District Court**
For the Northern District of California

I

A

Plaintiff was born on July 26, 1949.  She alleges that she has been unable to work since January 26, 2000 due to physical ailments.  Her work history includes experience as a secretary and administrative secretary.  From 1986 until the onset of her alleged disability, she held both positions at the Monterey County Office of Education.  Her primary duties there included recording and transcribing meeting minutes, maintaining records and answering the telephone.  Administrative Record, Doc #14 (AR) at 42, 56. Plaintiff has a high school diploma and has taken college course work but did not receive a college degree.  Id at 42.

Plaintiff first sought treatment for work-related injuries in 1994, at which time she complained of right lateral forearm pain due to repetitive keyboard use and was diagnosed with repetitive motion syndrome.  AR 135.  In April of 1996 she saw Dr John P Colman, an orthopedic specialist acting as agreed medical examiner (AME), whose findings included overuse syndrome involving the right shoulder girdle and upper extremity related to repetitive computer activities.  AR 129.  Dr Colman found plaintiff's symptoms to be "consistent with a myofascial pain syndrome or fibrositis [fibromyalgia]."  Id.  He also noted that previous electrodiagnostic testing and x-rays had been unremarkable.  Id. In December of the same year, x-rays taken at Salinas Urgent Care indicated early degenerative disc disease at C6-7, with some anterior osteophytic spurring, but otherwise unremarkable results.  AR 133.

\\

**United States District Court**
For the Northern District of California

On July 26, 1997, Dr Colman examined plaintiff again and concluded that her disability had reached a permanent and stationary status.  AR 130.  He stated that her residual disability left her with the equivalent of 25% of her pre-injury capacity for lifting, pushing, pulling, grasping, pinching, holding, torquing or performing other activities of comparable physical effort as well as activities requiring finger dexterity with the right dominant upper extremity.

From 1996 through 1999, plaintiff sought intermittent treatment for her symptoms from one Dr Galicia, whose first-hand impressions are not included in the administrative record.  But the reports of the other physicians show that, in 1998, Dr Galicia diagnosed plaintiff with acute right lateral epicondylitis with a prior history of cervical trapezius myofascial pain syndrome.  AR 130.  In January of 1999, Dr Galicia reported that plaintiff was responding well to occupational hand therapy but still complained of right lateral elbow pain.  Id.  Dr Galicia prescribed the anti-inflammatory drug Daypro as well as physical therapy.

In 1999 Dr Galicia moved his practice to the other side of Salinas, making it difficult for plaintiff to continue seeing him.  AR 131.  She was referred to Dr Warren Nishimoto, a family physician and osteopath.  Id.  According to Dr Nishimoto, plaintiff reported "increasing right hand numbness and weakness," although the Tinel's and Phalen's tests (used to assist in determining whether a patient suffers from carpal tunnel syndrome) were negative.  Id.  Dr Nishimoto also noted cervical lesions.  Id.  He prescribed muscle-relaxant medication and treated the lesions with osteopathic manipulation.  Id, AR 252.

3

United States District Court

For the Northern District of California

    In January of 2000, Dr Colman, again acting as AME, examined plaintiff and analyzed an MRI of her cervical spine.  He noted degenerative disc space narrowing at C5-6 and C6-7 with slight impaction of the inferior plate at C6 as well as mild arthritic changes at C4-5 and C7-T1.  AR 124.  There was no sign of cord or nerve root compression, no herniation and no stenosis.  Id.

    At the examination, plaintiff reported increasing muscle stiffness and tightness over her right shoulder girdle, across the neck and upper back extending toward left upper extremity; symptoms of muscle tightness and cramping that can spread down to her lower back; frequent tightness or cramping in thighs when she tries to go to bed at night; problems sleeping; and problems opening jars.  AR 131-32.  She stated that it was becoming harder and harder to perform her regular job duties.  Id at 132.

    Dr Colman found "trigger point" tenderness over plaintiff's paraspinous muscles in the cervical thoracic, mid-thoracic spine and lumbar areas, with the greatest tenderness over the cervical thoracic area and specifically over the trapezius areas bilaterally.  AR 132-33.  He also found increased tenderness over the lateral elbow area and lateral epicondylar region, with some mild tenderness in the same area on the left, as well as trigger point tenderness over the paraspinous muscles in the mid-thoracic area and near the lumbrosacral junction.  Id.

    Dr Colman stated that plaintiff's disability was "permanent and stationary."  AR 125.  Due to the "natural progression of the disease," he considered plaintiff's upper extremity disability to be equivalent to 50% loss of pre-injury capacity for lifting, pushing, pulling, grasping, pinching,

holding, torquing and performing other activities of comparable physical effort as well as activities requiring fingertip dexterity with the right dominant upper extremity.  Id.  Dr Colman concluded that plaintiff was now a "qualified injured worker" for retraining purposes.  Id.

Plaintiff saw Dr Nishimoto as her treating physician approximately every two to four weeks from December 1999 through January 2002.  AR 152-55.  Throughout that period, Dr Nishimoto's diagnoses included neuropathy, id at 252, muscle spasms, id at 248, and generally pain in the right hand through to the neck.  He also noted fibromyalgia as a "presenting complaint."  Id at 249.  Dr Nishimoto prescribed various pain-relieving and muscle-relaxing medications, including Robaxin, id at 254, Valium, id at 246, Arthrotec, id at 183, Depomedral, id at 167, Vioxx, id at 165, Effexor, id at 161, and Soma.  Id at 45.  Non-medicative treatment included yoga, id at 231, exercise classes, osteopathic manipulation, id at 230, water and stretching classes, id at 226, and electrode-induced muscle stimulation.  Id at 217.

On December 17, 1999, Dr Nishimoto stated that plaintiff was not able to perform her usual work.  One week later he approved a return to her full-duty work schedule, considering her condition not to be permanent and stationary.  Id at 251.  At the start of February 2000, however, he authorized vocational rehabilitation, id at 241, and at the end of that month he issued a disability certificate due to "continued back and neck pains."  Id at 239.  On May 1, 2000, he assessed plaintiff to be "totally disabled" from performing any occupation but able to stand for eight hours and lift 25 pounds.  Id at 230.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Plaintiff showed some improvement in response to various

2  treatments until she slipped and fell at a Target store on June 3,

3  2000.  AR 225.  The following day she reported pain in her right

4  wrist, right leg, neck, shoulder and lower back.  Id.  On June 19,

5  2000, Dr Nishimoto approved a one-month disability certificate, id

6  at 223, which he later extended until the end of August of that

7  year, noting "condition unchanged."  Id at 219.  On July 7, 2000,

8  Dr Nishimoto reported plaintiff's condition as permanent and

9  stationary to the State of California.  Id at 214.  At that time he

10 stated that plaintiff was not able to perform her usual line of

11 work but would be able to perform another, unspecified line of

12 work.  Id at 215.

13    Accordingly, plaintiff began taking real estate courses

14 on September 6, 2000, AR 201, but she stopped taking them a few

15 months later as her symptoms worsened, leaving her unable to grip a

16 pen for a length of time sufficient to complete the forms and tests

17 required for obtaining a realtor's license.  Id at 41.  On January

18 30, 2001, plaintiff's symptoms again worsened after she fell down a

19 small flight of stairs and landed on her right hand.  Id at 185.

20    On February 7, 2001, plaintiff visited the consultative

21 neurologist Dr Dale A Helman for an EMG nerve conduction study and

22 needle examination.  AR 139.  The results of both tests were

23 unremarkable, with no evidence of significant neuropathy or

24 radiculopathy (compression of the nerve roots in the cervical or

25 lumbar spine).  Id.  She then saw Dr Helman for a neurological

26 examination on December 12, 2001 (with an allegation of "repetitive

27 use — neuropathy").  Id at 135-38.  At the examination, plaintiff

28 reported severe, relatively constant pain and numbness radiating

United States District Court

For the Northern District of California

from the right upper extremity proximally to her arm and neck region, as well as some weakness in the right upper extremity. Id at 135. Dr Helman's review of the MRI scan of the cervical spine showed evidence of degenerative changes at the middle and lower levels but nothing he considered "surgical." Id at 136. He diagnosed plaintiff with repetitive motion syndrome, "most likely tendinitis or something very similar that involves chronic stress to the soft tissues." Id at 137. In his opinion, her disability should "encompass any activity that involves repetitively using her upper extremities or hands." Id. Dr Helman concluded that the restrictions will remain in place until plaintiff's symptoms improve, "if they ever do[.]" Id.

On January 29, 2002, plaintiff's treating physician Dr Nishimoto summarized his impressions over the preceding years and assessed plaintiff's then-current condition. AR 153. He stated that she continued to suffer from cervical, thoracic and lumbar strain. Id. Plaintiff could "do very minimal things at home before that activity will aggravate her condition, forcing her to stop." Id. Dr Nishimoto stated that plaintiff's condition was permanent and stationary and that she would be kept "off work." Id. Finally, he noted that plaintiff had tried vocational therapy but that it only exacerbated her symptoms. Id.

Plaintiff's last examination described in the administrative record was performed by Dr Ian MacMorran, orthopedic surgeon acting as consultative physician, on August 24, 2002. At the examination, plaintiff reported pain, numbness and cramping in her right hand, arm and shoulder, radiating to her neck, left arm, back and lower back. AR 262-63. She also reported frequent

headaches.  Id at 263.  Due to these symptoms, plaintiff claimed that she was unable to perform routine daily tasks such as shopping, writing, vacuuming and folding laundry.  Id at 262-63. She further stated that she was unable to sit for more than fifteen minutes without pain, to stand or walk for more than one or two hours at a time, and to sleep without difficulty.  Id at 263.  To attempt to alleviate the pain, she was taking stretching classes and walking as much as her symptoms allowed.  Id at 264.

Dr MacMorran found spinous process tenderness in the lower cervical region, cervical paraspinal muscle spasms and tenderness posteriorly at the right and left.  AR 267.  He noted a 20% loss of overall range of cervical-spine motion compared to normal.  Id.  Dr MacMorran also found thoracic paraspinal muscle tenderness posteriorly on the right and left as well as paraspinal tenderness in the lower lumbar area, but no spinous process tenderness in the mid- and lower thoracic and lower lumbar regions. Id.  According to his report, plaintiff could squat all the way down and rise to the standing position with slight right knee pain and had a normal gait.  Id.  His diagnoses included fibromyalgia, bilateral carpal tunnel syndrome, lateral epicondylitis and bilateral shoulder sprain.  Id at 271.  Dr MacMorran assessed that plaintiff's disability was caused by "elements of cumulative trauma and also by the disease process of fibromyalgia."  Id at 274.  He considered her to be "burdened with the problem of chronic pain for the rest of her life" and stated that "she is unable to do any types of work, sitting, standing, or walking for at least twelve months."  Id.  He concluded that plaintiff was "precluded from all types of work in the competitive job market."  Id.

United States District Court

For the Northern District of California

**B**

On September 27, 2001, plaintiff filed an application for disability insurance benefits with the SSA, listing her disability onset date as January 26, 2000. AR 78-80. She based her claim on repetitive use syndrome and neuropathy, which were causing pain, stiffness, numbness and spasms. Id at 90. The SSA denied the application on December 20, 2001, stating that "[t]hough you have discomfort, the evidence shows you are still able to move about and to use your arms, hands and legs in a satisfactory manner," and concluding that "you have the ability to perform [the work of an administrative secretary]." Id at 64. Plaintiff then filed a request for reconsideration, which the SSA denied. Id at 68, 70-73. Following her husband's death on April 10, 2002, plaintiff filed an application for widow's insurance benefits (based on disability) on June 3, 2002. Id at 282.

On March 14, 2002, plaintiff filed a request for a hearing before an administrative law judge (ALJ). AR 74. The hearing, which involved issues common to both the primary and the widow's benefits applications, took place in Monterey, California, on October 7, 2002. Id at 37. Plaintiff, her attorney and a vocational expert (VE) were present. Id.

At the hearing, plaintiff testified that Dr Nishimoto had diagnosed her with repetitive use syndrome and fibromyalgia, which were worsening over the years. AR 44. She testified to continuous numbness in her hands and right arm, frequent cramping in her shoulders and neck, frequent pain and tightness from her neck down into her lower back, pain often reaching from her back into her legs, and spasms throughout her body. Id at 44-48. Due to these

9

United States District Court

For the Northern District of California

symptoms, plaintiff further testified to the inability to sit or stand for more than one half-hour at a time; to perform any repetitive motion without pain, such as brushing her teeth, picking up a fork or blow-drying her hair — in fact, she had selected a short hairstyle for that reason; to hold a newspaper or book at eye-level; to bend forward at the waist without pain; to lift, push or pull heavy items; to turn a round doorknob; to write monthly statements and checks without spasms and pain; to rotate her neck sufficiently to permit her to drive safely; to cook for herself on more than rare occasions; to handle heavier laundry such as blankets and sheets; to fall asleep reliably and to sleep continuously through the night.  Id.  At the time of the hearing, plaintiff was taking Vioxx, Soma, Effexor and Tylenol, which she testified impaired her thought processes and made driving even more difficult.  Id at 45, 52.

The ALJ then posed a hypothetical question to the VE that assumed an individual with the residual functional capacity (RFC) for light exertional work activity and only the following additional limitations:  no repetitive keyboarding and no repetitive use of the right hand, but occasional ability to pinch, hold, torque, push, pull and grasp with the right upper extremity. Id at 56.  The VE stated that such an individual would not be able to perform the work of administrative secretary — plaintiff's previous occupation — and that the job skills plaintiff possesses would not transfer to any positions matching the hypothetical RFC and further limitations.  Id at 56-57.

The VE was able to identify just one position that a person with this hypothetical profile could perform:  school bus

United States District Court

For the Northern District of California

monitor, of which there are approximately 22,600 positions in California.  Id at 57.  Under questioning by the ALJ and plaintiff's attorney, the VE stated that this job involves monitoring the conduct of students on school buses to maintain discipline and safety; assisting in loading and unloading the bus; riding the bus to prevent altercations between students; disembarking from the bus at railroad crossings; and participating in bus safety drills.  Id at 58.  He testified that it "can be an eight-hour a day job," but "[s]ometimes it's less," and that it would require sitting and/or standing for more than one half-hour at a time.  Id at 59-60.

In her decision issued on November 6, 2002, the ALJ denied plaintiff's application for disability benefits.  Id at 30. She concluded that, while plaintiff does have medically determinable "severe" impairments, she also possesses the RFC for a wide range of light exertional work further limited to no repetitive keyboarding and no repetitive use/manipulation of the right hand.  Id at 29.  Based on this RFC and plaintiff's age, education and work experience, the ALJ also found that Rule No 202.14 in Table No 2 of Appendix 2, Subpart P, Regulations No 4 would support a conclusion of "not disabled."  Id at 30, 20 CFR § 1569.  The ALJ further noted that the VE identified significant numbers of jobs that an individual with plaintiff's limitations and vocational profile could still perform.[1]  AR 30.

---

[1]In this section of her decision, the ALJ actually specified an exertional capacity for sedentary — not light exertional — work. But based on the testimony of the VE and the table that the ALJ cites from Appendix 2 of Subpart P, she apparently meant to refer to light exertional work.  Because the disposition of this matter does not depend on that distinction, the court is not remanding the matter to the ALJ for clarification.

United States District Court

For the Northern District of California

1    The ALJ reached these conclusions by finding plaintiff's
2  contentions regarding subjective pain and the associated
3  limitations to be "not entirely credible."  Id at 27.  She stated
4  that the frequency, severity and duration of plaintiff's alleged
5  back, neck and upper extremity pain were "not consistent with the
6  treating medical records."  Id.  The ALJ also noted that
7  plaintiff's EMG and nerve conduction study had been unremarkable,
8  with no evidence of significant neuropathy or radiculopathy.  Id.
9  In addition, she found that plaintiff's medical treatment had been
10 "routine and not particularly aggressive," and that there were "no
11 continuous side effects of medication."  Id.  Regarding plaintiff's
12 claim of fibromyalgia and the associated pain in her fingers,
13 hands, arms, shoulders, neck and back, the ALJ stated that "[i]n
14 the absence of medical evidence to support such allegations, I
15 cannot give weight to this testimony."  Id.

16    In reaching her conclusions, the ALJ gave minimal weight
17 to the opinions of plaintiff's treating physician, Dr Nishimoto,
18 who had assessed plaintiff as temporarily disabled at various times
19 and ultimately restricted her from working.  Id at 26.  According
20 to the ALJ, "the minimally abnormal objective medical findings
21 simply do not support such an extreme assessment."  Id.  She noted
22 that Dr Nishimoto's records did not reveal detailed examinations of
23 or physical findings related to plaintiff's musculoskeletal
24 structure, nor did they contain any laboratory tests, such as
25 x-rays or MRI scans, that would support his opinions.  Id.

26    The ALJ also gave minimal weight to the assessment of Dr
27 MacMorran, the consultative orthopedic surgeon.  Id at 27.  Dr
28 MacMorran had diagnosed plaintiff with fibromyalgia, bilateral

United States District Court

For the Northern District of California

carpal tunnel syndrome, lateral epicondylitis, and bilateral
shoulder strain.  Id at 26-27.  He stated that plaintiff's back and
neck conditions prevent any type of lifting, bending, stooping,
pulling or pushing activities, and that plaintiff was unable to
stand for more than five minutes, sit for more than thirty minutes,
and grasp/open doorknobs.  Id at 27.  He concluded that plaintiff
was precluded from all types of work in the competitive job market.
Id.  Again, the ALJ responded that "the objective medical findings
simply do not support such an extreme assessment."  Id.  Moreover,
she stated, Dr MacMorran had only examined plaintiff on one
occasion, giving rise to no longitudinal physician-patient
relationship.  Id.  Specifically regarding the diagnosis of
fibromyalgia, the ALJ stated that, "in light of the absence of
significant treatment, this diagnosis and the attendant residual
functional capacity is found to be not persuasive."  Id.  She went
on to note that Dr MacMorran had found no spinous process
tenderness in the mid and lower thoracic and lower lumbar regions,
although he did find paraspinal muscle tenderness posteriorly on
the right and left.  Id.  The ALJ also stated that, when examined
by Dr MacMorran, plaintiff had a normal gait, was able to squat all
the way down and rise to the standing position with slight knee
pain, and had full range of motion of the shoulders, elbows,
wrists, forearms, and knees.  Id.

       The ALJ based her conclusions regarding plaintiff's
alleged disability on the assessment of the consultative
neurologist Dr Helman, who had examined plaintiff twice.  Id at 25.
She noted that Dr Helman's impressions included "repetitive motion
syndrome, most likely tendinitis or something very similar that

United States District Court

For the Northern District of California

involves chronic stress to the soft tissues," resulting in a work restriction from "any activity that involves the repetitive use of the upper extremities or her hands."  Id.  But the ALJ also noted that Dr Helman's neurological, sensory and cervical spine examinations of plaintiff were normal.  Id.  Accordingly, she concluded that "the findings and assessment of Dr Herman [sic] allow for a wide range of light work."  Id.

The ALJ also reviewed the assessment of the orthopedic specialist Dr Colman, who had examined plaintiff and her records as an AME in both 1996 and 2000.  Id at 25, 127, 129.  She did not, however, specify the weight that she gave to his assessment, nor did she mention his impression of myofascial pain syndrome and fibrositis (fibromyalgia) in the 1996 examination.  Id at 25, 129.

On January 7, 2003, plaintiff requested review of the ALJ's decision.  Id at 11.  On August 8, 2003, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became final.  Id at 4.  On October 9, 2003, plaintiff commenced the instant action for judicial review of the final decision.


                                  II

The court's jurisdiction is limited to determining whether the SSA's denial of benefits is supported by substantial evidence in the administrative record.  42 USC § 405(g).  A district court may overturn a decision to deny benefits only if the decision is not supported by substantial evidence or if the decision is based on legal error.  See <u>Andrews v Shalala</u>, 53 F3d 1035, 1039 (9th Cir 1995); <u>Magallanes v Bowen</u>, 881 F2d 747, 750 (9th Cir 1989).  The Ninth Circuit defines "substantial evidence"

as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ. See id; Magallanes, 881 F2d at 750.  The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation."  Andrews, 53 F3d at 1040.

"Disabled" is defined as "unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 404.1527.

To determine whether a claimant is disabled and entitled to benefits, the SSA conducts a five-step sequential inquiry.  20 CFR § 404.1520; 20 CFR § 416.920.  Under the first step, the ALJ considers whether the claimant is currently employed in substantial gainful activity.  If not, the second step examines whether the claimant has a "severe impairment" that significantly affects his or her ability to conduct basic work activities.  In step three, the ALJ determines whether the claimant has a condition which "meets" or "equals" the conditions outlined in the Listings of Impairments in Par 404, Subpart P, Appendix 1.  20 CFR § 404.1520. If the claimant does not have such a condition, step four asks whether the claimant can perform her past relevant work.  If not, in step five the ALJ considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy.  20 CFR §§ 404.1520(b)-(f); §§ 404.920(b)-(f).

United States District Court

For the Northern District of California

1     In steps four and five, the ALJ makes her determination
2  based on the claimant's residual functional capacity (RFC).  An RFC
3  is the "*maximum* remaining ability to do sustained work activities
4  in an ordinary work setting on a *regular and continuing* basis[.]"
5  Social Security Ruling (SSR) 96-8p [emphasis in original].  A
6  "regular and continuing basis," according to the SSA's own
7  interpretation of the Act and regulations, means eight hours a day,
8  five days a week, or an equivalent work schedule.  Id.  Moreover,
9  the regulations themselves require a claimant to demonstrate the
10 inability to perform work on a "sustained basis."  20 CFR §
11 404.1512(a).  Accordingly, the adjudicator must determine which
12 work activities a claimant can perform eight hours a day, five days
13 a week or an equivalent work schedule, taking into account her
14 functional limitations.

15     In this circuit, cases distinguish among the opinions of
16 three types of physicians:  (1) treating physicians; (2) non-
17 treating examining physicians; and (3) those who neither examine
18 nor treat the claimant.  <u>Lester v Chater</u>, 81 F3d 821, 830 (9th Cir
19 1995).  As a general rule, more weight is given to the opinion of a
20 treating source than a non-treating one.  Id.  Where the treating
21 doctor's opinion is not contradicted by another doctor, it may be
22 rejected only for "clear and convincing reasons."  <u>Baxter v
23 Sullivan</u>, 923 F2d 1391, 1396 (9th Cir 1991).  Even if the treating
24 doctor's opinion is contradicted by another doctor, the ALJ may not
25 reject this opinion without providing "specific and legitimate
26 reasons."  <u>Murray v Heckler</u>, 722 F2d 499, 502 (9th Cir 1983).

27     Plaintiff makes three general arguments in support of
28 this appeal.  First, she points to a discrepancy in the ALJ's

United States District Court

For the Northern District of California

determination of plaintiff's RFC:  in her decision, the ALJ first found that "[plaintiff] has the residual functional capacity for a wide range of light exertional work," AR 29, only to base her conclusions in the subsequent paragraph "on an exertional capacity for sedentary work," id at 30; plaintiff argues that this court should not affirm such irreconcilable findings.  Doc. # 23-1, Pl br at 16-17.  Second, plaintiff asserts that the ALJ improperly relied on a part-time occupation — school bus monitor — as the basis for meeting defendant's burden of proof at step five.  Id at 17-19. Finally, plaintiff argues that the ALJ improperly rejected evidence of plaintiff's subjective complaints in determining her RFC for performing other work.  Id at 19-22.

        After a careful review of the entire administrative record, the court concludes that this case must be remanded to the SSA because (1) the ALJ failed to make proper findings in support of her decision that plaintiff's pain complaints were not credible; and (2) the ALJ impermissibly discounted the assessment of plaintiff's treating physician.  In light of these conclusions, it is unnecessary for the court to address plaintiff's remaining contentions.


                                A

        Reduced to its essence, this case turns on the apparent disparity between plaintiff's subjective pain symptoms and the underlying medical signs and findings.  The Social Security Act directly addresses such cases:

        An individual's statement as to pain or other symptoms
        shall not alone be conclusive evidence of disability as
        defined in this section; there must be medical signs and

United States District Court

For the Northern District of California

findings, established by medically acceptable clinical or
laboratory diagnostic techniques, which show the existence
of a medical impairment that results from anatomical,
physiological, or psychological abnormalities which could
reasonably be expected to produce the pain or other
symptoms alleged and which, when considered with all
evidence required to be furnished under this paragraph
* * * would lead to a conclusion that the individual is
under a disability.

42 USC § 423(d)(5)(A).  See also 20 CFR § 404.1529(b) (symptoms

such as pain, fatigue, shortness of breath, weakness and

nervousness will not be found to affect ability to do basic work

activities absent medical signs or laboratory findings showing a

medically determinable impairment).

        The law governing the ALJ's responsibilities in cases

involving excess pain is well-developed in this circuit.  "Excess

pain" is "pain at a level above that supported by medical

findings."  Chavez v Department of Health and Human Services, 103

F3d 849 (9th Cir 1996).  If a claimant is able to produce objective

medical evidence of an underlying impairment, an ALJ may not reject

his subjective complaints based solely on lack of objective medical

evidence to corroborate the alleged severity of pain.  Moisa v

Barnhart, 367 F3d 882, 885 (9th Cir 2004).  If the ALJ finds the

claimant's pain testimony not to be credible, the ALJ "must

specifically make findings that support this conclusion."  Id.

Absent "affirmative evidence that the claimant is malingering," the

ALJ must provide clear and convincing reasons for rejecting the

claimant's testimony regard the severity of symptoms.  Id.

        At no time during the period under consideration has the

record been entirely devoid of medical signs and findings that

could account for some degree of pain.  According to the medical

reports in the administrative records, plaintiff was variously

18

United States District Court

For the Northern District of California

diagnosed with repetitive motion syndrome, myofascial pain syndrome, degenerative disc disease, lateral epicondylitis, mild arthritic changes, neuropathy and fibromyalgia throughout the period from 1994 to shortly before the hearing in 2002.  The ALJ identified no "affirmative evidence that the claimant is malingering" and was therefore required to provide clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her pain.  The ALJ did not do so, but merely concluded that all the doctors who examined plaintiff were unable to identify clinical findings that could account for the degree of plaintiff's pain.  Indeed, the ALJ's determination that plaintiff was "not entirely credible" turned entirely on the absence of corroborating medical findings.  This is a legally insufficient basis for rejecting a claimant's subjective complaints of pain. "If an adjudicator could reject a claim for disability simply because a claimant fails to produce medical evidence supporting the severity of the pain, there would be no reason for an adjudicator to consider anything other than medical findings." <u>Bunnell v Sullivan</u>, 947 F2d 341, 347 (9th Cir 1991).

"Clear and convincing reasons" for rejecting plaintiff's testimony regarding subjective pain must accordingly go beyond a mere discrepancy between the objective medical findings and the alleged severity of pain.  Once a medically determinable basis that could cause the alleged pain has been established, 20 CFR § 1529(c) describes the kinds of evidence that the adjudicator must consider in addition to the medical evidence when assessing a claimant's credibility:

\\

United States District Court

For the Northern District of California

(1)   The individual's daily activities;

(2)   The location, duration, frequency and intensity of the individual's pain or other symptoms;

(3)   Factors that precipitate or aggravate the symptoms;

(4)   The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)   Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)   Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e g, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms

Not only did the ALJ fail to consider many of these factors, but this court's consideration of them provides clear and convincing reasons to find plaintiff's claims to be credible — just the opposite of the ALJ's finding.

First, plaintiff's uncontradicted testimony established that she significantly restricted her daily activities in response to her pain.  She had difficulty grasping a fork, brushing her teeth and blow-drying her hair — the latter even leading her to keep her hair short.  AR 47, 51.  Plaintiff could only perform limited shopping and, due to her medication and inability to rotate her neck, driving.  Id at 52-54.  After selling her home for financial reasons, she moved into a house with hardwood floors that she would not need to vacuum.  Id at 53.  Plaintiff testified that she cooked infrequently, and that her pain so disrupted her sleep that she could not plan her activities for subsequent days.  Id.
\\

In addition, the location, duration, frequency and intensity of plaintiff's pain show a consistent pattern of worsening and spreading over the years, with piecemeal improvement in response to treatment but frequent aggravation caused by falls or particular movements.  The pain that started primarily in her right hand and arm slowly spread into her shoulders and neck, and from there into her left arm, lower back and even legs. Medication, along with periods of rest and physical therapy, helped to slow the long-term progression of the symptoms.  AR 185, 221. But a sudden pulling motion, a fall down stairs and a fall at a department store all aggravated her symptoms and accelerated their spread.  Id at 130, 185, 225.  And according to plaintiff's uncontradicted testimony, even sitting or standing for more than thirty minutes at a time exacerbated her spasms and pain.  AR 49.

Plaintiff took pain relievers and muscle relaxers on a continual basis, including Robaxin, Daypro, Vioxx, Valium, Soma, Effexor and Tylenol.  AR 25, 45.  She responded to unpleasant side effects — such as upset stomach — by switching medications, but testified to continued side effects of impaired thought processes and lethargy.  AR 27, 45.  Moreover, in addition to medication, plaintiff underwent treatments such as physical therapy, stretching classes, osteopathic manipulation and muscle stimulation (for which she even rented a muscle-stimulation device).  Id at 130, 226, 217, 206.   And in her uncontradicted testimony, plaintiff described other symptom-relieving measures such as daily walks to maintain muscle flexibility; lying down to alleviate daily headaches; and moving about after no more than thirty minutes of sitting in order to prevent and alleviate muscle spasms.  Id at 46, 49.

United States District Court

For the Northern District of California

1    The final factor that 20 CFR § 1529(c) lists for
2    determining a disability claimant's credibility is a catch-all
3    consideration:  "Other factors concerning [claimant's] functional
4    limitations and restrictions due to pain or other symptoms."  As
5    the ALJ noted, medical examinations demonstrated that plaintiff had
6    a full range of motion of the lumbar and thoracic spine, as well as
7    the hips; had a normal gait; was able to squat all the way down and
8    rise to a standing position with slight knee pain; and had full
9    range of motion of the shoulders, elbows, wrists, forearms and
10   knees.  AR 25, 27.  But these findings miss the point.  Plaintiff
11   never asserted an inability to perform any of these motions in
12   isolated instances; instead, she claimed an inability to perform or
13   refrain from performing certain motions repetitively, or on a
14   sustained and predictable basis, without significant pain and
15   spasms.

16       Further reinforcing plaintiff's credibility is the fact
17   that none of her examining physicians expressed any disbelief of
18   her symptoms, or even raised the possibility that she might be
19   exaggerating.  Dr Nishimoto, plaintiff's treating physician,
20   declared her to be totally disabled at various times and ultimately
21   restricted her from work — despite what the ALJ characterizes as
22   "minimally normal objective medical findings."  AR 26.  The
23   consultative examiner Dr MacMorran concluded that plaintiff was
24   "precluded from all types of work in the competitive job market,"
25   again despite the ALJ's view of the objective medical findings.  Id
26   at 274.  And Dr Colman, the orthopedic specialist who examined
27   plaintiff twice as an AME, concluded that her symptoms were most
28   consistent with myofascial pain syndrome or fibrositis

United States District Court

For the Northern District of California

(fibromyalgia), and that she would no longer be able to perform her

then-current job.  Id at 125, 129.  Even Dr Helman, the neurologist

on whose assessment the ALJ relies most, based his conclusions

solely on his objective findings and made no comment regarding

plaintiff's credibility.  See id at 135-38.

        The ALJ's refusal to credit plaintiff's pain testimony is

especially troubling in light of the multiple diagnoses of

fibromyalgia, a condition that can account for the degree of pain

plaintiff testified to experiencing.  Fibromyalgia, previously

called fibrositis, is "a rheumatic disease that causes inflammation

of the fibrous connective tissue components of muscles, tendons,

ligaments, and other tissue."  Benecke v Barnhart, 379 F3d 587,

589-90 (9th Cir 2004).  Common symptoms include

> chronic pain throughout the body, multiple tender
> points, fatigue, stiffness, and a pattern of sleep
> disturbance that can exacerbate the cycle of pain and
> fatigue associated with this disease.  Fibromyalgia's
> cause is unknown, there is no cure, and it is
> poorly-understood within much of the medical
> community.  The disease is diagnosed entirely on the
> basis of patients' reports of pain and other
> symptoms.  The American College of Rheumatology
> issued a set of agreed-upon diagnostic criteria in
> 1990, but to date there are no laboratory tests to
> confirm the diagnosis.

Id at 590.

        Dr Colman, acting in his capacity of AME, first diagnosed

plaintiff with fibromyalgia (then known as fibrositis) in 1996.  AR

129.  The administrative record does not contain the first-hand

impressions of Dr Galicia, plaintiff's treating position before

1999.  But Dr MacMorran, who reviewed plaintiff's medical records in

2002, noted that "[d]uring [the period from 1996 to 2000], Ms

Sanchez had a diagnosis of myofascial pain syndrome and also

United States District Court

For the Northern District of California

1  fibromyalgia."  Id at 262.  Dr Nishimoto, who became plaintiff's

2  treating physician in 1999, lists fibromyalgia as a "presenting

3  complaint" — one that he did not contest — in January of 2000.  Id

4  at 249.  And in 2002, Dr MacMorran concluded that "[t]he disability

5  of Ms Sanchez is caused by elements of cumulative trauma and also by

6  the disease process of fibromyalgia."  Id at 274.

7          This medical evidence, however, is not as strong as it

8  could be.  None of these records sets forth in any detail the basis

9  for a fibromyalgia diagnosis.  It does not appear, moreover, that

10 plaintiff was ever referred to a rheumatologist for follow-up by a

11 physician in the relevant field of specialty.  Nonetheless, there is

12 no contradictory evidence in the record stating that plaintiff did

13 not have fibromyalgia.  The ALJ's own rejection of this diagnosis is

14 based on "the absence of medical evidence" as well as the "lack of

15 significant treatment[.]"  Id at 27.  But as noted above, a

16 diagnosis of fibromyalgia relies on patient's reported symptoms as

17 opposed to objective medical evidence.  Benecke, 379 F3d at 590.

18 And plaintiff had been seeing physicians for her symptoms at least

19 intermittently from 1994 through 1999, AR 125-30, and every two to

20 four weeks from the end of 1999 to the start of 2002, during which

21 times she underwent continuous medicative and non-medicative

22 treatment.  Id at 125-30, 152-250.  This evidence may not

23 conclusively support a diagnosis of fibromyalgia, but it does

24 nothing to contradict the fibromyalgia diagnoses that various

25 physicians made — which in turn tend to reinforce the credibility of

26 plaintiff's testimony.

27          In sum, the ALJ failed to provide "clear and convincing"

28 reasons that tend to undermine plaintiff's credibility, which the

24

available evidence actually tends to support.  Accordingly, it was legal error for the ALJ to disregard plaintiff's testimony regarding her subjective pain and functional limitations.


                                    B

          The ALJ also erred in discounting the assessment of the treating physician, Dr Nishimoto, who found plaintiff to be totally temporarily disabled at various times and ultimately restricted her from work in January 2002.  AR 26, 153.  The adjudicator is generally to give more weight to the opinions of a treating physician than to the opinions of other physicians who may or may not have also examined the claimant.  Lester, 81 F3d at 830.  The Commissioner is required to give weight not only to the treating doctor's clinical findings and interpretation of test results, "but also to his subjective judgments."  Id at 832-33 (citing Embrey v Bowen, 849 F2d 418, 422 (9th Cir 1988)).  The treating physician's continuing relationship with the claimant makes him "especially qualified * * * to form an overall conclusion as to functional capacities and limitations[.]"  Id at 833.

          Where the treating doctor's opinion is not contradicted by another doctor, the adjudicator may reject it only for "clear and convincing" reasons.  Id at 830 (citing Baxter v Sullivan, 923 F2d 1391, 1396 [9th Cir 1991]).  If the treating doctor's opinion is contradicted by another doctor, the adjudicator may not reject it without providing "specific and legitimate reasons" supported by substantial evidence in the record.  Id (citing Murray v Heckler, 722 F2d 499, 502 [9th Cir 1983]).  In this case, Dr Nishimoto's opinion — which restricted plaintiff from work — is contradicted by

United States District Court

For the Northern District of California

the opinion of Dr Helman, the consultative neurologist.  After examining plaintiff and conducting an EMG nerve conduction study of her upper extremities, Dr Helman concluded that plaintiff's disability "should encompass any activity that involves repetitively using her upper extremities or hands," thus allowing for the possibility of non-repetitive, light exertional work.  AR 137. Accordingly, the ALJ must provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr Nishimoto's conclusion.  See <u>Lester</u>, 81 F3d at 830.

        The ALJ gave the following reasons for rejecting Dr Nishimoto's conclusion:

> The minimally abnormal objective medical findings simply do not support such an extreme assessment. Dr Nishimoto's records are devoid of any description of detailed examinations of or physical findings related to the claimant's musculoskeletal structure that would support such assessments. Nor do Dr Nishimoto's records contain any laboratory tests, i e, x-rays, MRI scans which would support his opinions * * *.

AR 26.  The ALJ thus provided specific reasons for her findings, but she rejected Dr Nishimoto's opinion for essentially the same reason that she discounts plaintiff's credibility:  the lack of medically determinable findings that would account for the severity of the symptoms and functional limitations that plaintiff described — a severity that Drs Nishimoto, MacMorran and Colman credited without question.  And where, as here, a claimant's symptom testimony had been shown to be credible, disbelief alone does not supply the substantial evidence required to support the specific reasons that the ALJ gives: "[s]heer disbelief is no substitute for substantial evidence." <u>Benecke</u>, 379 F3d at 594.

\\

United States District Court

For the Northern District of California

1          Accordingly, it was error for the ALJ to give only

2    minimal weight to the conclusions of plaintiff's treating

3    physician.

4

5                              III

6          Having determined that the ALJ committed legal errors

7    requiring reversal, the court must now determine the proper remedy.

8    42 USC section 405(g) provides:  "The court shall have power to

9    enter, upon the pleadings and transcript of the record, a judgment

10   affirming, modifying, or reversing the decision of the [SSA], with

11   or without remanding the cause for a rehearing."  In the normal

12   case in which the ALJ is determined to have committed legal errors,

13   a district court will remand the case for redetermination applying

14   the correct legal standard or for enhancement of the record if

15   appropriate.  Benecke, 379 F3d at 593.  Where the record has been

16   fully developed and further administrative proceedings would serve

17   no useful purpose, however, the district court should remand for an

18   immediate award of benefits.  Id.

19         Where, as here, the ALJ improperly rejects the claimant's

20   testimony regarding her limitations, and the claimant would be

21   disabled if the testimony were credited, remand for the purpose of

22   having the ALJ make findings regarding that testimony is

23   inappropriate.  Lester, 81 F3d at 834.  Furthermore, where the ALJ

24   improperly rejects the opinion of a treating or examining

25   physician, that opinion is credited "as a matter of law."  Id.

26         Thus crediting the disregarded evidence, and taking into

27   account the evidence in the record as a whole, the court finds that

28   plaintiff is unable to perform any type of physical activity on a

                                27

United States District Court

For the Northern District of California

sustained or repetitive basis.  Accordingly, the court concludes: (1) plaintiff was disabled throughout the period for which she seeks benefits by pain caused by her physical ailments; (2) that considering the extent of plaintiff's functional limitations, she would not be able to perform her past work or any other work available in substantial numbers in the national economy; and (3) there is no reason to augment the record in this matter nor to delay further the resolution of a benefits application that has already been pending for nearly six years.  The plaintiff is entitled to an award of benefits.

Having resolved this matter for the reasons stated above, the court finds it unnecessary to consider the other arguments that plaintiff has advanced.

This matter is remanded to the SSA for payment of benefits to plaintiff.  The clerk is directed to close the file and terminate all pending motions.

IT IS SO ORDERED.


VAUGHN R WALKER
United States District Chief Judge